IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEAST DIVISION

| | |
|---|---|
| ALARM FUNDING ASSOCIATES, LLC, a Maryland limited liability company,<br><br>    Plaintiff,<br> vs.<br>SECURITY ALARMS OF AMERICA, LLC, a Missouri limited liability company; and WAYNE ROWLAND, individually,<br><br>    Defendants. | Civil Action No.<br><br>COMPLAINT<br>JURY DEMANDED |

Now Comes Plaintiff, ALARM FUNDING ASSOCIATES, LLC, complaining of Defendants SECURITY ALARMS OF AMERICA, LLC, and WAYNE ROWLAND, as follows:

## SUMMARY OF COMPLAINT

Plaintiff is an alarm security funding and acquisition company. Defendants are engaged in the sale, installation and monitoring of residential and commercial burglar and fire alarm systems in the areas surrounding Cape Girardeau, Missouri. Plaintiff regularly purchases alarm contracts from dealers like Defendants in order to provide dealers with capital for operations. Defendant sold Plaintiff over 400 customer accounts through a series of five agreements in exchange for initial payments totaling in excess of $300,000. However, months later after not receiving all of the money they believed to be due under the parties' agreement, Defendants decided to help themselves by systematically stealing the customer accounts back through blatant misrepresentations and in violation of nearly every material provision of the parties' agreements. Plaintiff

1

brings this suit to enjoin Defendants from stealing additional accounts and for money damages associated with its conduct.

## PARTIES

1. Plaintiff Alarm Funding Associates, LLC is a Maryland limited liability company with its principal office and places of business in Pennsylvania and Maryland.

2. Upon information and belief, Defendant Security Alarms of America, LLC is a Missouri limited liability company with its principal place of business in Cape Girardeau, Missouri.

3. Upon information and belief, Defendant Wayne Rowland is an individual primarily residing in Cape Girardeau, Missouri.

## JURISDICTION AND VENUE

4. Diversity jurisdiction over Plaintiff's claims is proper under 28 U.S.C. § 1332.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1331 and 1391.

## BACKGROUND FACTS

6. Plaintiff is an alarm security funding and acquisition company.

7. Defendants are engaged in the sale, installation and monitoring of residential and commercial burglar and fire alarm systems in the areas surrounding Cape Girardeau, Missouri.

8. Plaintiff regularly purchases alarm contracts from dealers like Defendants in order to provide dealers with capital for operations.

9. On April 10, 2014, Plaintiff and Defendants signed a letter of intent for Defendants to sell Plaintiff certain of their alarm contracts.

2

10. Between April and August, 2014, Plaintiff conducted significant due diligence on Defendants' customer accounts to determine if each account met certain criteria Plaintiff has established over the years in determining whether an account qualifies for purchase.

11. During the due diligence process, Plaintiff became aware of state and federal tax liens potentially encumbering Defendants' accounts.

12. On August 1, 2014, Plaintiff and Defendant signed the first of five contracts (Asset Purchase and Sale Agreement, hereinafter "APA") through which Plaintiff purchased a portion of Defendants' customer accounts. The August 1, 2014 APA authorized Plaintiff to payoff Defendants' state and federal liens out of the money due to Defendants.

13. Plaintiff and Defendants executed four more APA contracts on August 13, 2014, August 28, 2014, September 24, 2014 and December 15, 2014 respectively.

14. Plaintiff purchased in excess of 400 customer contracts from Defendant through the various APA contracts (hereinafter "Purchased Accounts").

15. Each APA contract is identical except for the purchase price and identification of accounts.[1]

16. The APA establishes a Purchase Price for each Purchased Account of 36 times the monthly recurring revenue generated by the account less certain offsets.

17. In essence, the APA provided Defendant with an up-front payment of three years worth of revenue on each Purchased Account.

---

[1] The APA contracts are all identical except as to the number of customer contracts conveyed and the dollar amount paid. The Complaint will collectively refer to all of the contracts as the APA except where indicated by specific date of execution.

18. The APA divides payment of the purchase price into two installments.

19. The first installment consists of 85% of the Purchase Price payable at the time of closing.

20. The second payment, referred to in the APA as the "Holdback," is somewhat akin to the concept of retainage in the construction industry. The Holdback consists of the remaining 15% of the Purchase Price and is payable thirteen months after closing provided certain conditions are satisfied.

21. The total purchase price under the APA contracts was approximately $355,623.

22. The APA contracts required initial up-front payments totaling approximately $302,280 and total Holdback payments of $54,343.

23. Plaintiff paid Defendants the initial up-front payments totaling approximately $302,280 in accordance with the terms of the APA.

24. The APA literally transferred ownership of the customer accounts, future revenue stream and the customer contracts themselves to Plaintiff at the closing of the transaction.

25. Defendants delivered physical possession of the customer contracts supporting the Purchased Accounts at or near the time of closing.

26. The parties thereafter issued a notice to the Purchased Accounts announcing that Plaintiff would be assisting Defendants with billing services and that future payments should be made out to Defendant SAA but sent to Plaintiff's office in West Chester, PA.

27.     The purpose of structuring the announcement in this manner was to preserve the goodwill associated with the Purchased Accounts by allowing Defendants to maintain their customer relationships thereby increasing the likelihood that the Purchased Accounts would continue to use the monitoring service in the future.

28.     The Purchased Accounts thereafter began sending payments to Plaintiff's office in West Chester, PA where Plaintiff would deposit the payments into its own account for its own benefit in accordance with the APA.

## Qualifying Accounts

29.     Pursuant to the terms of the APA, each Purchased Account must satisfy certain conditions to qualify for purchase.

30.     Each APA refers to its own Exhibit A, which is a spreadsheet with the details of the Purchased Accounts and the total recurring monthly revenue for each account.

31.     Each account must satisfy the conditions in the APA for at least one year after purchase in order for Defendants to be entitled to payment of the Holdback. Importantly, and as explained in greater detail below, one such condition is that the account must annunciate at Purchaser's designated central station.

32.     If during the first year, one or more of the Purchased Accounts no longer meets all of the stipulated conditions, such as failing to annunciate at Plaintiff's designated central station, Defendant must submit a replacement account or Plaintiff would be entitled to a credit against what it had already paid by adjusting the Holdback.

## Swinging the Lines

33. The APA required Defendants, at Defendants' expense, to "cause all alarm systems associated with the [accounts] to annunciate at [Plaintiff's] designated Central Monitoring Station within a 90-120 day period."

34. To help Defendant obtain that end, the APA also transferred ownership of Defendants' 1-800 telephone numbers to Plaintiff, which would allow Plaintiff to assist Defendants with accomplishing its contractual responsibility to cause the accounts to annunciate at a different monitoring station.

35. At the time of transfer of ownership, Defendants' phone lines provided alarm monitoring services to **all** of Defendants' accounts, including hundreds of accounts that Plaintiff decided not to purchase from Defendants.

36. Defendants utilized Alarm Central, LLC, as a central monitoring station to monitor their customers' security systems.

37. Plaintiff's lender has not approved Alarm Central, LLC for monitoring services. Plaintiff consequently needed to move the phone lines from Alarm Central to COPS Monitoring.

38. Defendants repeatedly asked Plaintiff to delay the swing of the phone lines for various reasons.

39. In May, 2015, Plaintiff discovered the real reason why Defendants wanted to delay the swing of the phone lines was because Defendants owed Alarm Central, LLC in excess of $14,000 for monitoring services dating prior to the execution of the APA contracts. Defendants, of course, failed to disclose this debt prior to the execution

6

of the APA and continued to conceal that information from Plaintiff after the sale of the Purchased Accounts.

40.     Alarm Central naturally would not allow the Purchased Accounts to swing to another monitoring company without payment of its bill, which at that point constituted an encumbrance on the Purchased Accounts.

41.     Plaintiff offered Defendants to pay down the balance owed for prior monitoring on the Purchased Accounts if Defendants agreed to allow a credit against the Holdback. Defendants inexplicably refused to agree. Not really having a choice in the matter though, Plaintiffs paid Alarm Central $10,544 to the benefit of Defendants so that Alarm Central would release the Purchased Accounts for transfer to a central monitoring station suitable to Plaintiff.

42.     Defendants still needed to remove the non-purchased accounts from the telephone lines in order for the swing to occur without jeopardizing the security of the non-purchased accounts remaining on the 1-800 lines.

43.     Plaintiff does not have any personal identifying information for Defendants' non-purchased accounts (name, address, number, etc.). Accordingly, if Plaintiff swung the non-purchased accounts to another monitoring station, the customers would effectively go unmonitored because the new station would not be able to associate an alarm signal with any particular customer address.

44.     Plaintiff made several demands on Defendants to remove the 300 or so non-purchased accounts from the 800 number so that Plaintiff could execute the swing.

45.     Defendants repeatedly stalled in responding to or complying with the request, which prevented Plaintiff from swinging the lines.

46. None of the Purchased Accounts, therefore, annunciated at Plaintiff's monitoring station in accordance with the APA.

47. The failure of the Purchased Accounts to annunciate as required was due to Defendants' utter lack of cooperation in refusing to remove his own non-purchased accounts from the lines.

48. Therefore, Plaintiff was technically entitled to reduce the Purchase Price to zero dollars, meaning that Defendants would be entitled to no Holdback whatsoever.

49. While that was not Plaintiff's intention at the time, Plaintiff nevertheless refused to release the Holdback with the hope that Defendants would ultimately comply with the APA so Plaintiff could complete the swing.

50. Instead of simply complying with the APA by removing their accounts from the telephone lines, Defendants intentionally chose to violate yet another provision of the APA by attempting to steal the accounts back in secret and in contravention of the parties' no-solicitation agreement.

**Defendants "repossess" the Purchased Accounts in violation of the APA**

51. Because Plaintiff was advancing three years worth of payments under the purchased contracts, Plaintiff required Defendant to sign a ten year non-solicitation agreement.

52. Exhibit C (attached hereto as Exhibit 1 to the Complaint) to the contracts states:

> AFA shall pay to Seller, which payments will benefit Seller, as consideration for this Agreement the. amounts called fur under the Purchase and Sale Agreement for the Alarm Accounts. In recognition and specific acknowledgment of AFA's legitimate need to protect its investment in the

8

Purchased Accounts, Seller, jointly and severally, covenant and agree that they shall not:

*********

(b) for a period of ten years following the date of transfer of each Alarm Account under the Purchase and Sale Agreement, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Alarm Account providing services for which such Alarm Account is obligated to make payments of Monitoring Rate (as defined in the Purchase and Sale Agreement) to AFA, or accept or otherwise engage in any such business with such Alarm Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing *Payment* for Net Month1y Maintenance Revenue, and Section L4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement

(c) for a period of ten years following sale of a Purchased Account by AFA, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Purchased Account providing any services in the residential or commercial burglar or fire alarm business, or accept or otherwise engage in any such business with such Purchased Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing Payment for Net Monthly Maintenance Revenue, and Section 1.4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement

53. In short, the no-solicitation agreement prevents Defendants from redirecting payments on Purchased Accounts or unlawfully interfering with the Purchased Accounts for a 10 year period.

54. In January 2016, Plaintiff began to realize that several of the Purchased Accounts had become past due.

55. In February, 2016, Plaintiff approached Defendants about the possible reasons for the accounts becoming past due, at which time Defendants stated that they had somehow "repossessed the accounts," as if that were even an option under either the APA or Missouri law.

9

56. Indeed, Plaintiff thereafter discovered that Defendant had actually been contacting Purchased Account customers in secret prior to his announcement that he was "repossessing the accounts."

57. Upon information and belief, Defendants told Plaintiff's Purchased Account customers that the relationship with Plaintiff "did not work out" and that the customers should send all payments to Defendants instead of Plaintiff.

58. Defendants thereafter began usurping customers and cashing the monthly checks.

59. Plaintiff is informed and believes that Defendants have usurped upwards of 100 of the Purchased Accounts, or nearly 25% of the portfolio.

60. Upon information and belief, Defendants continue to attempt to poach the portfolio by causing Purchased Accounts to "cancel" their contracts or by otherwise redirecting the payment stream to Defendants.

61. Plaintiff has lost hundreds of thousands of dollars in future revenue as the result of Defendants' conduct and Plaintiff stands to suffer irreparable injury to the goodwill associated with the portfolio if the Court does not enjoin Plaintiff from further interfering with the contractual relationships between Plaintiff and the Purchased Account customer base.

**FIRST CLAIM FOR RELIEF**
**(Agency, Alter-Ego, Piercing Corporate Veil).**

62. Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

63. Upon information and belief, Defendant Security Alarms of America, LLC, is owned and operated solely by Defendant Wayne Rowland as its sole member.

64. By his actions as set forth above, Defendant Rowland has frustrated the contractual expectations of Plaintiff.

65. Upon information and belief, Defendant Rowland has flagrantly disregarded corporate formalities of Defendant Security Alarms of America.

66. Defendant Rowland's actions constitute fraud for the benefit of Security Alarms of America.

67. Upon information and belief, Defendant Wayne Rowland exercises complete domination and control over Defendant Security Alarms of America's finances, policies and business practices such that it operates merely as an alter ego.

68. Upon information and belief, Defendant Security Alarms of America is financially dependent on Defendant Rowland.

69. The fraud, domination, control and aforesaid acts of Defendant Rowland justify piercing the corporate veil.

70. Defendant Rowland should be liable for any and all acts complained of herein by Defendant Security Alarms of America, which acts have damaged Plaintiff in an amount greater than $75,000.00.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract and Injunctive Relief)

71. Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Between August and December of 2014, Defendants agreed to sell approximately 413 of its customer accounts.

73. As a condition and in consideration for the purchase of the Purchased Accounts, each account must satisfy certain terms and conditions.

74. As set forth above, Defendant failed and refused to provide 413 qualifying accounts.

75. Defendant has also actively solicited and usurped at least 100 Purchased Account in violation of Exhibit C to the contracts.

76. Plaintiff has fully performed its obligations under the contracts.

77. Breaches of Exhibit C have caused irreparable harm to Plaintiff.

78. Continued breach of Exhibit C will further subject plaintiff to unfair competition, and Plaintiff will have irretrievably lost the benefit of its agreement with Defendants.

79. Plaintiff has no adequate remedy at law to protect its business and property rights because the damages from the breach of the contracts and Exhibit C by Defendants will be considerable and may not be capable of either repayment or ascertainment. Further, Defendants conduct is causing the portfolio to lose goodwill, which amounts to the loss of an intangible benefit as the relationship between Plaintiff, Defendant and the customers erodes due to Defendants' actions.

80. Defendants are liable to Plaintiff for actual damages in excess of $75,000, and Plaintiff is entitled to preliminary and permanent injunctive relief prohibiting Defendants from breaching Exhibit C to the contracts.

## THIRD CLAIM FOR RELIEF
### (Tortious Interference with Contract)

81. Plaintiff incorporates by reference, repeats and realleges every allegation contained in the foregoing paragraphs as if fully set forth herein.

82. Plaintiff purchased approximately 413 contracts from Defendant.

83. Subsequent to the purchase, the Purchased Accounts mailed payments to Plaintiff's office in West Chester, PA.

84. Plaintiff has valid contracts with each Purchased Account.

85. Defendants no longer have any interest in the Purchased Account contracts and therefore have no right to receive payment in connection with the contracts.

86. Defendants engaged in fraud and tortious conduct by fraudulently telling customers from the purchased accounts that the relationship with Plaintiff did not work out and that they should resume making payments to Defendants' local office.

87. Defendants intentionally and willfully pursued the contracts and misled the customers of the Purchased Accounts so Defendants could receive the payments intended for Plaintiff's benefit.

88. Defendants used unlawful means by which they intentionally and willfully induced the customers of the purchased accounts to pay Defendants instead of Plaintiff.

89. Defendants' actions were calculated to cause damage to Plaintiff's lawful business.

90. Defendants' conduct is without right or justifiable cause.

91. Defendants' actions were with malice and without justification.

92. Defendants' actions were done with the unlawful purpose of causing damage and loss without right or justifiable cause.

93. As a result of Defendants' actions, Plaintiff has been damaged by Defendants' actions in an amount greater than $75,000.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment – All Defendants)

94. Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in this Complaint as if fully set forth herein.

95. Plaintiff and Defendants contracted for the purchase and swing of customer alarm contracts.

96. Plaintiff could not effectuate the swing of the Purchased Accounts without paying Alarm Central's outstanding encumbrance on the accounts.

97. Plaintiff accordingly paid Alarm Central the sum of $10,544.

98. Defendants received the benefit of the $10,544 payment as the liability to Alarm Central was personal to Defendants.

99. Plaintiff's payment of the $10,544 debt was under such circumstances that Defendants knew the payment was not made gratuitously and it would be unjust for Defendants to retain the benefit.

100. As a direct and proximate result of Defendants' unlawful actions, Defendants have been unjustly enriched to the detriment of Plaintiff.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

101. Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

102. Plaintiff is the lawful owner of the Purchased Accounts.

103. Plaintiff is the lawful owner of all payments made under the purchased accounts.

104. Defendants have caused the customers from many of the Purchased Accounts to make all past and future payments to Defendants.

105. Defendants have exercised sole dominion and control over many of the Purchased Accounts, payments and future payments, to the exclusion of all others.

106. Plaintiff has made demand, and hereby again demands the return of all of the payments made by customers of Purchased Accounts.

107. Defendants have refused to return the payments made to Defendants by customers from the Purchased Accounts.

108. Plaintiff asks for mandatory injunctive relief ordering these defendants to return all such payments and accounts.

109. Plaintiff has been damaged by an amount greater than $75,000 as a result of Defendants' conversion.

## SIXTH CLAIM FOR RELIEF
### (Unfair Competition)

110. Plaintiff incorporates by reference, repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth

15

herein.

111. Defendants, in connection with the marketing and pursuit of the purchased contracts, made a false representation regarding their right to service those contracts and receive payments, which misrepresentation was likely to deceive or mislead the customers to the detriment of Plaintiff.

112. Defendants, in connection with the market and pursuit of the purchased contracts where Plaintiff was identified as the supplier of services, made misrepresentations regarding the services that were likely to deceive and mislead the customers to the detriment of Plaintiff.

113. As a result of Defendants' actions, Plaintiff has been damaged by Defendants' actions in an amount greater than $75,000.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, for the following relief:

1. A temporary, preliminary and permanent injunction against Defendants and any and all of their employees, agents, servants, independent contractors, or any other person acting on their behalf from:

   a. directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Alarm Account providing services for which such Alarm Account is obligated to make payments of Monitoring Rate (as defined in the Purchase and Sale Agreement) to AFA (as those terms are defined in the contracts between Plaintiff and Defendant), or accept or otherwise engage in any such business with such Alarm Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing *Payment* for Net Month1y Maintenance Revenue, and Section L4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement

   b. directly or indirectly on his or its own behalf or as seller, employee

16

or consultant for another, contact, solicit or otherwise seek to do business with such Purchased Account providing any services in the residential or commercial burglar or fire alarm business, or accept or otherwise engage in any such business with such Purchased Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing Payment for Net Monthly Maintenance Revenue, and Section 1.4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement.

2. That the court enter compensatory and punitive damages in an amount greater than $75,000.00, the exact amount to be shown at trial;

3. That Plaintiff be awarded its reasonable attorneys' fees for breach of contract pursuant to the attorney fee provisions therein;

4. That Plaintiff be awarded an amount greater than $75,000 against Defendants for the breaches of the contracts;

5. That Plaintiff be awarded punitive damages against Defendants;

6. That Plaintiff be awarded interest and costs; and

7. Such other relief as this Court deems just and equitable, including all relief requested in the various Claims for Relief themselves.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to each issue set forth herein.

This the 5th day of August, 2016

                                                      By:    /s/ Brett E. Dressler
                                                               Brett E. Dressler (Fed. Bar No. 34516NC)
                                                               Plaintiff's Lawyer
                                                               bdressler@sellersayers.com

Sellers, Ayers, Dortch and Lyons, P.A.
410 Cameron-Brown Building
301 South McDowell Street
Charlotte, NC 28204-2686
(704) 377-5050
(704) 339-0172 Facsimile